UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSULTATIVE EDUCATION | : | |
| PARTNERS, LLC | : | |
| 5305 Village Center Drive, Suite 271 | : | |
| Columbia, MD 21044, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | No. |
| | : | |
| DEREK NEWBERRY | : | |
| 221 S 12TH Street S709 | : | |
| Philadelphia, PA 19107, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

COMES NOW Plaintiff Consultative Education Partners LLC, by and through its attorneys Nachmias, Morris & Alt, P.C., and states the following:

### PARTIES, JURISDICTION, AND VENUE

1.      Consultative Education Partners, LLC, a/k/a Redhead Consulting, a/k/a Percipient Partners ("Percipient" or "Plaintiff") is a Maryland corporation that maintains its principal place of business in Columbia, Maryland, at the address set forth in the case caption.  Percipient is in the business of providing consulting services, expertise, and thought leadership to assist businesses in implementing successful, enduring change initiatives and growth strategies, in the areas of organizational culture, financial acumen, high-performing teams, and strategic communications.

2.      Defendant Derek Newberry ("Mr. Newberry" or "Defendant") is a resident of the State of Pennsylvania, and was at one time an employee of Percipient.

1

3.      The amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

4.      Count I sets forth an action that arises under the copyright laws of the United States and presents a question of federal law.  This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

5.      Counts II and III set forth actions that arise under the laws of the Commonwealth of Pennsylvania, and are disputes between parties of diverse citizenship. This court has subject matter jurisdiction over these actions pursuant to 28 U.S.C. §§ 1332 and 1367.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTS COMMON TO ALL COUNTS

7.      As a regular part of its business, Percipient provides consulting services and delivers seminars, through its individual employees and its independent contractors, on behalf of the Wharton Business School of the University of Pennsylvania ("Wharton"), Decision Sciences International ("DSI") (a subsidiary of Heidrick & Struggles), Duke Corporate Education ("Duke CE"), and other companies.

8.      Specifically, in 2008, Duke Corporate Education ("Duke CE"), a not for profit entity of Duke University and a premier provider of customized leadership solutions to large corporations around the world, engaged Percipient and one of its employees to present a leadership session for Duke CE's client, Raytheon.

9.      Since 2008, Percipient has provided faculty (both employees and independent contractors), teaching materials, case studies, online videos, webinars, and custom solutions to Duke CE to benefit its clients.

2

10.     Duke CE has included Percipient in senior-level projects at companies such as Raytheon, Chick-fil-A, Rio Tinto, AECOM, Aegon, Astellas, Caterpillar, Chevron Phillips Chemical, Ingersoll Rand, Novelis, SASAC, Shenzhen, and Union Pacific.

11.     Percipient's billings to Duke CE average $40,000.00 to $70,000.00 per year for the work provided by Percipient, its employees, and independent contractors working on Percipient's behalf to deliver projects for Duke CE clients.

12.     When Percipient was incorporated in Maryland in March of 2006, the members of Percipient were Joseph Perfetti ("Mr. Perfetti"), Steven Feld, and Venard Scott Koerwer ("Mr. Koerwer"), each owning a one-third interest in the business. Steven Feld exited the business in February 2012, leaving each of Mr. Perfetti and Mr. Koerwer with a 50% ownership interest in the business.

13.     In 2013, Percipient adopted the trade name Redhead Consulting.

14.     In 2014, Percipient entered into an agreement pursuant to which Mario Moussa ("Dr. Moussa") made investments in the company that, upon completion of the investments, provided him a 25% ownership interest in the company, and reduced the respective ownership interests of Mr. Perfetti and Mr. Koerwer to 37.5% each.

15.     In 2015, Percipient made application to the State of Maryland to do business under the trade name Percipient Partners.

16.     In 2015, Mr. Koerwer exited the business by selling his entire ownership interest to Mr. Perfetti.  As of September 2015, therefore, Mr. Perfetti owned 75% of the company and Mr. Moussa owned 25% of the company.  Mr. Perfetti and Mr. Moussa thereafter made several capital contributions to the company during 2014 and 2015.

17.     As owners of all member interests in the company Mr. Koerwer, Mr. Perfetti and Dr. Moussa agreed to hire employees for the company in 2014 and to develop intellectual property for the company.

18.     In or about June 2014, Percipient hired as employees Madeline Boyer ("Ms. Boyer") and Mr. Newberry, both of whom were doctoral candidates at the time, to be employed consultants providing services to Percipient clients on behalf of the company. Pursuant to their terms of employment, Ms. Boyer and Mr. Newberry each received an annual salary of $90,000 from Percipient, as well as employee stock options. Ms. Boyer and Mr. Newberry were paid their salaries on a monthly basis, with Percipient withholding payroll taxes and social security taxes from their paychecks. Percipient paid for business insurance and unemployment insurance to cover these employees.

19.     Ms. Boyer's and Mr. Newberry's job duties included a wide variety of tasks, which were assigned to them by Percipient at its discretion.  One of these tasks was to develop consulting materials and papers on organization team building.  As this work was being undertaken, Percipient decided to collect and refine some of the most valuable material developed by the company into a book to be offered for publication.  This effort eventually yielded a book titled *Committed Teams* (the "Book" or the "Work").

20.     While still employed by Percipient, Ms. Boyer and Mr. Newberry were also thereafter hired as part-time employees by Wharton in August 2014, to serve as lecturers.

21.     Appropriate for its subject matter, the content of *Committed Teams* was the result of collaboration between and among Percipient minority-interest-owner Dr. Moussa, Percipient employees Ms. Boyer and Mr. Newberry, and seven independent contractors of Wharton from whom Percipient requested content for particular chapters. Each of the ten

4

content contributors (Dr. Moussa, Mr. Newberry, Ms. Boyer, and the seven Wharton contractors) were a primary author of some portion of the collective work.   Although thematically consistent, each chapter of the Book was essentially a stand-alone discussion of a particular team-related concept.

22.     Prior to and during the writing of the book, Dr. Moussa verbally promised each of the other nine contributing authors an equal share of royalties arising from any publication of the Work.

23.     Upon information and belief, none of the seven Wharton contractors executed agreements to transfer or assign the copyrights in their respective contributions to the Work.

24.     Dr. Moussa drafted several marketing plans in an effort to have the Work published.  The draft plans identify the seven Wharton contractors as authors, and state that Percipient will contribute resources toward marketing the Book.  The marketing plans are attached hereto as Exhibit A.

25.     Dr. Moussa first proposed publication of the Work to Wharton Press, a publisher associated with Wharton, under the working title *The Teamwork Equation*. Wharton Press declined to publish the Work, however, Dr. Moussa thereafter successfully proposed publication of the book to another publisher, Wiley & Sons, Inc. ("Wiley").

26.     On or about April 9, 2015, Dr. Moussa, Ms. Boyer, and Mr. Newberry entered into a written agreement with Wiley to publish *Committed Teams* (the "Publishing Agreement"), under the working title *The Teamwork Equation*.  Pursuant to the Publishing Agreement, Dr. Moussa, Ms. Boyer, and Mr. Newberry delivered to Wiley the first half of the book's manuscript on or before May 15, 2015.  The final manuscript was delivered to Wiley on or before August 15, 2015.

5

27.     In the Publishing Agreement, Dr. Moussa, Ms. Boyer, and Mr. Newberry purported to grant to Wiley "the full and exclusive rights comprised in the copyright of the work," including the exclusive right to publish and sell the Work. The Publishing Agreement further purported to grant Wiley a right to register the copyright in the Work. The Publishing Agreement also provided that Wiley would pay royalties to Dr. Moussa, Ms. Boyer, and Mr. Newberry, with each of these contracting parties to receive one-third of any royalties, subject to the terms of the Publishing Agreement. A copy of the Publishing Agreement is attached hereto as Exhibit B.

28.     Most of the content of the Work was created between May and August 2015, during which time Ms. Boyer and Mr. Newberry expended approximately 80% of their work time, while full-time employees of Percipient, writing the book for Percipient. All of the drafting and editing of the book was undertaken using Percipient tools, including Percipient's SLACK account, Drop Box account, Google Email accounts, and Evernote tools.

29.     As one of his duties as a Percipient employee, Mr. Newberry organized the contributions of the other nine contributors, including those of Percipient co-owner Dr. Moussa, Percipient employee Ms. Boyer, and of the seven independent contractors of Wharton, thereby transforming these independent authors' contributions from an unrealized collective work into the final Work. A copy of the first ten (10) pages of an early draft of the Work is attached hereto as Exhibit C.

30.     This title of the Work was changed to *Committed Teams*.  It was finished in November 2015, and was published by Wiley in March 2016.

31.     Pursuant to the Publishing Agreement, the Work includes a notice of copyright in the names of Dr. Moussa, Ms. Boyer, and Mr. Newberry. Within the Work, the seven

contributing authors that were contractors of Wharton are referred to as contributors, but not co-authors.

32.     In or about March 2016, Dr. Moussa voluntarily transferred his entire twenty-five percent (25%) economic interest in Percipient to Mr. Newberry and to Ms. Boyer, resulting in Mr. Perfetti continuing to own a 75% interest in the company, Mr. Newberry now owning a 12.5% economic interest in the company, and Ms. Boyer now owning a 12.5% economic interest in the company.

33.     Mr. Newberry voluntarily terminated his employment with Percipient in April 2016.

COUNT I

VIOLATION OF UNITED STATES COPYRIGHT ACT

34.     Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 33.

35.     Pursuant to 17 U.S.C. §§ 101 and 201(b), Percipient owns a portion of the copyright to the Work, as the Work was produced as a work made for hire for Plaintiff's benefit.

36.     Mr. Newberry was employed by Percipient at all times during the writing of the Work, and his labor and co-authorship was undertaken within the scope of his employment.

37.     It was understood by Mr. Newberry that the Work was a joint team project owned and funded by Percipient.

38.     All or substantially all of the drafting and editing of the Work was undertaken using Percipient's resources, including Percipient's electronic accounts including those on SLACK, DropBox for Business, Google Mail, and Evernote.

39.     Percipient engaged and paid a graphic artist to create the tools and exhibits that were to be used in the Work, and in associated consulting, teaching and training materials.

40.     Mr. Newberry used and displayed the content of the Work in video recordings and presentations on behalf of Percipient, to Percipient's clients.

41.     Percipient incurred significant costs in connection with the production and promotion of the Book, including marketing, public relations, photography, website production and maintenance, and travel costs.

42.     With the knowledge and consent of Mr. Newberry, a domain registration for a promotional website for the Work (www.committedteams.com) was purchased and maintained by Percipient for the company's benefit.  Percipient paid the cost of this website, as well as the cost of a video recording and other materials of the authors discussing the Book that was displayed on the website, and on Plaintiff's own website.

43.     Percipient also engaged and paid a professional photographer to take photographs of some of the co-authors, and these photographs are currently being used in the marketing for the Work.

44.     Mr. Newberry has infringed upon Percipient's copyright by attempting to assign Percipient's copyright to Wiley.  In doing so, Mr. Newberry has falsely represented to Wiley and to others that the Work is his own work, when he knew that the Book was a work made for hire.

45.     Mr. Newberry has also falsely represented to Wiley that he is personally entitled to royalties and other revenues arising from the work.

46.     The purported transfer of the copyright of the Work to Wiley, through the Publishing Agreement, was undertaken without the permission of all owners of the copyright of the material in the Work.  This violation of the Copyright Act was undertaken in contradiction of Plaintiff's right to determine whether and when to copy the Work, and Plaintiff's right to determine whether and when to distribute the Work.

47.     Defendant's unauthorized purported transfer of the copyright to Wiley resulted in loss of revenue to Plaintiff from licensing fees, and loss of control of the copying and distribution of the Work.

48.     By reason of Defendant's infringement, through his unauthorized purported assignment of Percipient's copyright, Plaintiff has sustained and will continue to sustain injury, loss and damage to its ownership rights in the Work, and is entitled to recover from Mr. Newberry damages sustained by Plaintiff as a result of Mr. Newberry's acts.  Plaintiff is at present unable to ascertain the full extent of the monetary damage it has suffered by reason of Mr. Newberry's acts of copyright infringement, but Plaintiff is informed and believes, and on the basis of such information and belief, alleges that Plaintiff has sustained such damage in the amount of at least $300,000.00.

49.     Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages he has obtained as a result of his acts of copyright infringement.  Percipient is at present unable to ascertain the full extent of the gains, profits, and advantages Mr. Newberry has obtained by reason of his acts of copyright infringement, but Plaintiff is informed and

9

believes, and on the basis of such information and belief, alleges that Mr. Newberry has obtained such gains, profits, and advantages in an amount exceeding $90,000.00.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendant on Count I of the Complaint and it be awarded:

(a) Actual damages in an amount in excess of $390,000.00 to be determined at trial, plus interest;

(b) Reasonable attorneys' fees and costs incurred by Plaintiff in prosecuting this action; and

(c) Such other and further relief as the Court deems just and proper.

## COUNT II
### VIOLATION OF EMPLOYEE'S DUTY OF LOYALTY

50. Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 49.

51. As an employee of Percipient, Mr. Newberry owed a fiduciary duty of loyalty to Plaintiff.

52. Mr. Newberry acted for a person or persons whose interests conflicted with Percipient's interests, when he acted for himself and/or for Dr. Moussa.

53. Mr. Newberry breached this duty, beginning in January 2016 and through the date of his resignation from employment, by diverting consulting, lecturing and teaching business from Percipient to himself, and/or to Dr. Moussa. A copy of email correspondence between Mr. Newberry and Duke CE, a client of Percipient, is attached hereto as Exhibit D.

10

54.     Mr. Newberry further breached this duty, by transferring Percipient's rights in the Work, without the consent of Percipient.

55.     Mr. Newberry further breached this duty by making material misrepresentations of fact to Percipient.

56.     In taking these actions, Mr. Newberry was acting to promote his own interests to the detriment of the Percipient.

57.     Percipient has suffered damages, as a direct result of Mr. Newberry's breach of his duty of loyalty.

58.     Percipient is at present unable to ascertain the full extent of the monetary damage it has suffered by reason of Mr. Newberry's breach of duty of loyalty, but Plaintiff is informed and believes, and on the basis of such information and belief, alleges that Plaintiff has sustained such damage in the amount of $390,000.00.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendant on Count II of the Complaint and it be awarded:

(a)     Compensatory damages in an amount in excess of $390,000.00 to be determined at trial, plus interest;

(b)     Punitive damages; and

(c)     Such other and further relief as the Court deems just and proper.

## COUNT III
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

59.     Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 58.

60.    There was a prospective contractual relationship between Percipient and Wiley, and between Percipient and other potential publishers of the Work, for the right to publish and sell the Work.

61.    There were also prospective contractual relationships between Percipient and Duke CE.

62.    Mr. Newberry purposely and specifically intended to prevent a prospective relation from occurring between Percipient and Wiley, by instead claiming rights to the Work in his individual capacity.

63.    Mr. Newberry purposely and specifically intended to prevent a prospective relation from occurring between Percipient and Duke CE.

64.    There was a complete absence of privilege or justification on the part of Mr. Newberry for these actions.

65.    Percipient has and will continue to sustain actual legal damage as a result of Mr. Newberry's conduct.

66.    Percipient is at present unable to ascertain the full extent of the monetary damage it has suffered by reason of Mr. Newberry's intentional interference, but Plaintiff is informed and believes, and on the basis of such information and belief, alleges that Plaintiff has sustained such damage in the amount of $390,000.00.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendant on Count I of the Complaint and it be awarded:

(a)    Compensatory damages in an amount in excess of $390,000.00 to be determined at trial, plus interest;

(b)    Punitive damages; and

12

    (c)        Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Robert J. Haupin, Esquire
Nachmias Morris & Alt, P.C.
20 Ash Street, Suite 200
Conshohocken, PA 19428
(610) 629-6640
(610) 629-6645

Of Counsel:

Steven J. Lewicky, Esquire
Megan O'Connor, Esquire
Davis, Agnor, Rapaport & Skalny
10211 Wincopin Circle, Suite 600
Columbia, MD  21044
(410) 995-5800

13

# EXHIBIT A

# The Teamwork Equation: Why 1 + 1 = 1.5
# And What You Can Do About It
## Authors' Marketing Platform

This book brings with it an outstanding marketing platform. Moussa and his co-authors teach in dozens of executive education programs and serve as academic directors at Wharton and Duke Corporate Education. *The Teamwork Equation* grows out of his team's experience and involvement with one of Wharton Executive Education's flagship programs, the Executive Development Program. The High Performance Teams component of the course, led by Moussa, is consistently one of the highest rated aspects of the program. Derek Newberry and Madeline Boyer are also lecturers for Wharton's undergraduate Management 100, an applied learning course that builds teamwork and collaboration skills with the entirety of every incoming freshman class (some 600 students each fall).

The Wharton School provides executive education to over 10,000 executives annually and markets to hundreds of thousands more. With its professional public relations staff, world-wide network of alumni, award-winning, bi-weekly web publications Knowledge@Wharton (which has some 750,000 subscribers) and Wharton@Work, and its value to both executive and undergraduate education, the Wharton School will provide vigorous support for *The Teamwork Equation*

In addition to executive education promotion, Mario Mousa's book *The Art of Woo* provides a separate, valuable marketing platform for *The Teamwork Equation*. *Woo* sold approximately 20,000 copies in its first year, and the authors expect a similar launch for *The Teamwork Equation*. In the course of promoting his strategic persuasion book, Moussa has become one of the nation's most noted experts on persuasion and negotiation. He is a seasoned media presenter, and delivers 150 workshops and keynotes each year to private and executive education clients. He also partners with consulting firms such as Decision Strategies International. DSI is also a thought-leading organization, with their own publications and PR platform that can be leveraged to promote *The Teamwork Equation.*

Finally, Mario Moussa's consulting firm, Redhead Consulting, will put substantial resources and effort behind this book. Redhead has committed to developing a separate web site for the book linked to its corporate site, and will be seeking ways to link the success of the book with its consulting brand. It will also be buying a substantial number of books for marketing purposes and to send to its existing clients. With offices in both Philadelphia and Baltimore, Redhead Consulting will be a key partner in marketing the book on the east coast as well as to the health care, financial services, and insurance industry markets.

With the power of one of the world's best business schools, an established author, willingness on the part of the authors to invest in PR, and the energy of a private consulting company all pulling together to promote *The Teamwork Equation*, the book is

sure to have a successful launch. With the ongoing publicity and sales associated with Wharton Executive Education and Moussa's workshops, this momentum will be easily sustained for years to come.

## Partial List of Mario Moussa's Consultant Clients

AARP
American Association of Medical Colleges
American Association of Plastic Surgeons
American Automobile Association
American Board of Internal Medicine
American College of Cardiology
American Legacy Foundation
American Organization of Nurse Executives
Annie Casey Foundation
ASIS
Aventis
Baker Hughes
Bristol-Myers Squib
Catholic Hospital Association
Cigna
Comcast
Compass
Cornell Medical Center
Ericsson
DePuy
DeutschePost WorldNet
Gap, Inc.
Georgetown University Medical Center
Goldman Sachs
GSK
Harley-Davidson
Hillier Architects
Independence Blue Cross
KMPG
Lane Construction
Marathon Oil
MarchFirst
McKee Construction
McKinsey & Company
McNeil
MedStar Health System
National Health Lawyers Association

National Opinion Research Council
Northeastern University Information Services
Novartis
Ortho-McNeil
PECO Energy
PNC Bank
PVH
Primavera
Professional Examination Service
ReedSmith
Robert Wood Johnson Foundation
State Farm Insurance
TeeKay Shipping
Templeton Foundation
UniMed (Brazil)
Unisys
UnitedHealthGroup
University of Pennsylvania Health System, Department of Neurology
University of Pennsylvania Health System, Department of Pathology
University of Pennsylvania Health System, Department of Surgery
University of Pennsylvania, Perelman School of Medicine, Center for Mental Health
Policy and Services Research
Venturi, Scott, Brown
Westfield
Wyeth

# The Teamwork Equation: Why 1 + 1 = 1.5
# And What You Can Do About It: Table of Contents

Introduction: "Can I Make My Team Work?"

Chapter 1: Be Your Own Observer

Chapter 2: Establish Commitments: Roles, Goals, and Norms

Chapter 3: Check Alignment

Chapter 4: Closing the Saying-Doing Gap

Chapter 5: The Science of the Blindingly Obvious?

Appendix A: The HPT Toolkit

Appendix B: Team Culture Assessment

Research Note: Team Structure, Process, and Performance

# The Teamwork Equation: Why 1 + 1 = 1.5
# And What You Can Do About It
## Authors' Marketing Platform

This book brings with it an outstanding marketing platform and brand.  Mario Moussa's previous book, *The Art of Woo: Using Strategic Persuasion To Sell Your Ideas* (co-authored with G. Richard Shell), has sold approximately 60,000 copies to date. Moussa has driven the bulk of those sales by using the book in executive education programs and distributing it at keynote addresses.

Moussa would continue to leverage these workshops and speaking engagements as a platform for promoting *The Teamwork Equation*, and the opportunities would be expanded by his co-authors, Madeline Boyer and Derek Newberry.  The three authors, who work with Wharton Executive Education, Duke Corporate Education, and consulting partners such as the firm Decision Strategies International, will collectively deliver two engagements per week on collaboration and teamwork.  With 50 participants per workshop on average, this would be a channel for selling 100 books per week.  Moussa also gives an additional 3-4 keynote presentations per month on team-related subjects, with each presentation having an average attendance of 50 executives.  This channel would lead to the sale of an additional 175 books per month.

Beyond workshops and presentations, the three authors manage 4-5 consulting projects per year with private clients that involve leadership and team development components.  *The Teamwork Equation* would be distributed to the key stakeholders in these projects, generating sales of about 200 books per year.

The book grows out of the authors' delivery of the High Performing Teams component of one of Wharton Executive Education's flagship programs, the Executive Development Program.  The extended team that delivers this component comprises an additional 12 independent consultants, faculty, and administrators at the University of Pennsylvania.  The consultants estimate that they would distribute the book in a total of 10 consulting engagements per year, a channel for selling an additional 400 copies.  One of the Wharton administrators on our team gives 30 copies per year to incoming MBA students.

In addition to these channels, the authors are committed to engaging in extensive PR support for *The Teamwork Equation*.  When Knowledge@Wharton disseminated an article on *The Art of Woo* to its 750,000 subscribers, the book shot up to #105 on the Amazon Bestsellers list.  We expect a similar PR boost from promotion through Knowledge@Wharton as well as another online publication, Wharton@Work.  We will also promote the book through Wharton's Sirius radio program, where Moussa has previously been a guest, and contacts at WHYY, where Moussa was interviewed about his first book on the popular talk-show *Radio Times*.  Based on Moussa's experience with *The Art of Woo*, we expect these collective PR efforts to sell an additional 10,000 copies in the year after publication.

As lecturers at Wharton, Newberry and Boyer will also promote this book to the approximately 400+ students they teach each year through the core undergraduate management course, a capstone course on teamwork, and a course on managing corporate culture.  We expect this to generate 100 additional book sales per year.

With the power of the world's best business schools, an established author, willingness on the part of the authors to invest in PR, and extensive client engagements, we estimate the potential for this book to sell 18,000 copies in its first year. With the ongoing publicity and sales associated with these consulting, PR and teaching platforms, this momentum will be easily sustained for years to come.

**Projected Year 1 Sales**

| Channel | Est. Sales per Year |
|---|---|
| Executive education workshops | 5200 |
| Keynote presentations | 2100 |
| Consulting engagements with private clients | 600 |
| Undergraduate teaching/student outreach | 100 |
| Media/PR | 10,000 |
| **Total** | **18,000** |

## Partial List of the Authors' Consulting Clients

AARP
American Association of Medical Colleges
American Association of Plastic Surgeons
American Automobile Association
American Board of Internal Medicine
American College of Cardiology
American Legacy Foundation
American Organization of Nurse Executives
Annie Casey Foundation
ASIS
Aventis
Baker Hughes
Bristol-Myers Squib
Catholic Hospital Association
Cigna
Comcast
Compass
Cornell Medical Center
Ericsson
DePuy
DeutschePost WorldNet
Gap, Inc.
Georgetown University Medical Center
Goldman Sachs
GSK
Harley-Davidson
Hillier Architects
Independence Blue Cross
KMPG
Lane Construction
Marathon Oil
MarchFirst
McKee Construction
McKinsey & Company
McNeil
MedStar Health System
National Health Lawyers Association
National Opinion Research Council
Northeastern University Information Services
Novartis
Ortho-McNeil
PECO Energy
PNC Bank
PVH

Primavera
Professional Examination Service
ReedSmith
Robert Wood Johnson Foundation
State Farm Insurance
TeeKay Shipping
Templeton Foundation
UniMed (Brazil)
Unisys
UnitedHealthGroup
University of Pennsylvania Health System, Department of Neurology
University of Pennsylvania Health System, Department of Pathology
University of Pennsylvania Health System, Department of Surgery
University of Pennsylvania, Perelman School of Medicine, Center for Mental Health
Policy and Services Research
Venturi, Scott, Brown
Westfield
Wyeth

# EXHIBIT B

978111915 7403

# WILEY

**AGREEMENT** made this 9th day of April 2015, between Mario Moussa 629 Pine Street Philadelphia PA 19106, Madeline Boyer 939 N. Bambrey St. Philadelphia PA, and Derek Newberry 2215 12th St. S709 Philadelphia PA 19107 (individually an **"Author"** and collectively the **"Authors"**) and John Wiley & Sons, Inc., 111 River Street, Hoboken, New Jersey 07030-5774 (the **"Publisher"**) with respect to a Work tentatively titled:

**The Teamwork Equation (the "Work").**

The Publisher and the Authors wish to work together to achieve the professional standards and success that they each desire from the Work, and agree as follows:

**Rights**

1.     The Authors hereby grant to the Publisher during the full term of copyright and all extensions thereof the full and exclusive rights comprised in the copyright in the Work, including any "Supplementary Materials" (as defined in Paragraph 2(a) below) and any revised editions, including but not limited to the right, by itself or with others, throughout the world, to print, publish, republish, distribute and transmit the Work and to prepare, publish, distribute and transmit derivative works based thereon, in English and in other languages, in all media of expression now known or later developed, and to license or permit others to do so. The Publisher's rights shall include but shall not be limited to:

    (a)   The exclusive right to publish and sell the Work in the English language in North America (the United States, its possessions and territories, Canada and Mexico), the Philippines, the British Commonwealth and the Republics of Ireland and South Africa, Europe and all other countries (the "Territory");

    (b)   Foreign-language rights throughout the world;

    (c)   Periodical or newspaper rights prior to or following book publication, including syndication rights throughout the world;

    (d)   Non-dramatic audio recording rights throughout the world;

    (e)   Motion picture, television, radio, stage dramatic and musical rights throughout the world;

    (f)   Commercial and merchandising rights throughout the world.

**Manuscript**

2.     (a)     The Authors agree to prepare and submit the final manuscript of the Work, to consist of approximately 60,000 words not later than August 15, 2015, unless the Publisher has agreed to extend the time in writing (the "Due Date"). The Authors shall submit the first half of the manuscript three months before the Due Date. The Authors shall also submit sample chapters from time to time as the Publisher may reasonably request. The final manuscript shall be submitted in the electronic format specified by the Publisher together with two printouts double-spaced on 8½" by 11" white paper printed on one side only with pages numbered consecutively, complete and satisfactory to the Publisher in organization, form, content, and style, accompanied by appropriate illustrative material, a table of contents and any additional material listed below (individually and collectively the "Supplementary Materials"), which shall be considered part of the Work:

    <u>Material</u>          <u>Due Date (if different from above)</u>

If the Authors fail to supply any Supplementary Materials or illustrative material on or before the Due Date, or to supply suitable copy for a final index when the proofs are returned, the Publisher shall have the right, but not the obligation, to obtain them and charge the reasonable cost against any sums due to the Authors.

Illustrative material submitted as part of the final manuscript shall be in the form of black and white drawings, photographs or high resolution computer renderings in a form suitable for direct use without redrawing, lettering or retouching by the Publisher.

The Authors shall, at the Authors' expense, submit with the final manuscript of the Work, written permissions, on a form approved by the Publisher, to use any copyrighted material which the Authors incorporate in the Work.

Any fonts used in material delivered to the Publisher in printer-ready form or otherwise intended to be reproduced in the form delivered whether in print or digitally shall be considered part of the Work and shall be limited to fonts from Adobe Font Folio 11 and/or approved open-source fonts. On the Due Date, Authors shall deliver a list of all fonts included in any such materials delivered to the Publisher.

2.    (b)    If the Authors deliver the final manuscript on or before the Due Date, the Publisher shall, within 90 days after such delivery, notify the Authors whether the manuscript is, in the Publisher's judgment, complete and satisfactory and, if it is not, request changes that would make the manuscript satisfactory to the Publisher. If the Authors do not make the changes requested by the Publisher within 30 days after receipt of such request, or if, notwithstanding such changes the manuscript is not, in the Publisher's judgment, complete and satisfactory, the Publisher may terminate this Agreement pursuant to Paragraph 21 below or make such other arrangements as the Publisher deems advisable to make the manuscript complete and satisfactory, in which event the reasonable costs of such arrangements may be charged against any sums due to the Authors. In the event the Publisher determines that the necessary revisions would be so extensive and fundamental that a satisfactory and timely revision would not be feasible, the Publisher shall have the right to deem the manuscript unsatisfactory without requesting changes and to terminate the Agreement pursuant to Paragraph 21 below.

2.    (c)    If the Authors do not receive the above notice from the Publisher within the prescribed period after timely delivery of the manuscript, the Authors may jointly request the Publisher in writing to notify the Authors whether the manuscript is complete and satisfactory to the Publisher and, if it is not, to indicate what changes would make it complete and satisfactory. If the Publisher does not respond to the Authors' request within 30 days after receipt of such request, the Authors may jointly terminate this Agreement pursuant to Paragraph 19 below.

2.    (d)    The Authors shall promptly correct and return proofs delivered to the Authors for that purpose and provide suitable copy for a final index from such proofs. If Authors' Alterations are made to the proofs, the costs incurred as a result thereof shall be borne by the Publisher to the extent of 15% of the cost of composition for the proofs originally submitted to the Authors, and the excess, if any, shall be charged against any sums due to the Authors. Authors' Alterations are defined as deletions, additions, and other revisions made by the Authors to the proofs, including any revisions made in the illustrations, other than to correct compositor's and/or proofreader's errors.

2.    (e)    If the Authors do not submit the final manuscript on or before the Due Date, the Publisher shall have the exclusive right but not the obligation to publish the Work. In such case, the Authors shall submit the final manuscript to the Publisher upon completion and the Publisher shall have 90 days from the date of receipt of the final manuscript to determine, in its sole discretion, whether it shall proceed under this Agreement or terminate this Agreement pursuant to Paragraph 21 below.

**Publication**    3.    (a)    Subject to the terms and conditions contained herein, the Publisher shall publish the Work in such style and manner as the Publisher deems appropriate, within eighteen (18) months from the date of the Publisher's acceptance of the final manuscript. Notwithstanding the foregoing, in the event either (i) the Work is significantly longer or shorter than specified in Paragraph 2(a) above; (ii) after the manuscript is accepted for publication, changes to the manuscript are made by the Authors with the Publisher's consent, revision of the manuscript is required due to unforeseen events or developments, technical errors require correction, or the Authors for any reason do not meet the Publisher's schedule for returning materials; (iii) delays result from acts or conditions beyond the control of the Publisher or its suppliers or contractors, including, but not limited to, war, fire, flood, labor disputes, governmental action, shortages of material,

riots, civil commotions or other similar causes; or (iv) publication must be delayed to accommodate first serial or book club use, then the Publisher shall publish the Work as soon as the Publisher deems practical.

**3.**   **(b)**   The Publisher shall promote and sell the Work in such manner and at such prices as it deems appropriate, and make any and all other arrangements it deems appropriate with respect to the Work and the rights thereto granted to it herein.

**Copyright Notice**   **4.**   The Publisher shall include in each copy of the Work published by it a notice of copyright in the Authors' names in conformity with the United States Copyright Act and the Universal Copyright Convention and require its licensees to do the same.  The Publisher shall have the right to register the copyright in the Work with the United States Copyright Office.  Any textual or illustrative material prepared for the Work by the Publisher at its expense may be copyrighted separately in the Publisher's name.

**Royalties**   **5.**   **(a)**   The Publisher shall pay to the Authors, as a royalty, the following percentages of the Publisher's "net receipts" (as defined below) from  sales or licenses of the Work:

|  |  | Percentages |
|---|---|---|
| (1) | from sales of a hardcover edition in the United States, its possessions and territories, and Canada: |  |
|  | 15% on the first 10,000 copies sold,;<br>17.5% on the next 10,000 copies sold, and;<br>20% on all copies sold thereafter. |  |
|  | Sales and licenses of the Work as set forth elsewhere in this Paragraph 5(a) shall not be included in the calculation of copies sold for the purpose of escalating royalties |  |
| (2) | (i)  from sales of a trade paperback or other softcover edition (except for a mass-market paperback edition) in the United States, its possessions and territories, and Canada: | 15% |
|  | (ii)  from sales of a mass-market paperback edition in the United States, its possessions and territories, and Canada: | 7½% |
| (3) | from sales of a hardcover edition elsewhere: | 10% |
| (4) | from sales of a trade paperback or other softcover edition (including a mass-market paperback edition) elsewhere: | 7½% |
| (5) | from sales or licenses of the Work or materials from the Work in electronic form, whether directly by the Publisher or indirectly through or with others: | 10% |
| (6) | From sales of any edition through direct-to-consumer marketing (including, for example, direct mail, but not including sales made via the Publisher's website): | 5% |
| (7) | from sales of the Work at discounts of 56% or more from list price or sold in bulk for premium or promotional use, or special sales outside the ordinary channels of trade: | 5% |
| (8) | from sales of the Work produced "on demand" when it is not feasible to maintain a normal inventory: | 5% |

| | | |
|---|---|---|
| (9) | from sales of non-dramatic audio recording and audio/video adaptations: | 7½% |
| (10) | From sales or licenses by the Publisher of the following subsidiary rights in the Work to third parties: reprint (50%); book club (50%); foreign language (50%); first serial (50%); second serial (50%); condensations (50%); motion picture (50%); dramatic and ancillary rights (50%); non-dramatic audio recording and audio/video adaptation rights (50%); commercial and merchandising rights (50%); public performance rights (50%); and in any media, permissions for quotations of short excerpts and photocopies (50%); in each case after deduction of the Publisher's out-of-pocket costs, if any, incurred in connection with such licenses. | |
| (11) | should Publisher undertake, either alone or with others, the activities described in (10): | 7½% |
| (12) | from sales or licenses of other adaptations and other derivative works, such as custom publications, not specified above: | 7½% |
| (13) | from use of all or a part of the Work in conjunction collectively with other work(s), a fraction of the applicable royalty rate equal to the proportion that the part of the Work so used bears to the entire collected work: | pro rata unless the excerpt from the Work is 5% or less of the entire Work in which case a standard permission fee shall be paid |

5.    (b)    [Intentionally deleted.]

5.    (c)    "Net receipts" are defined as United States Dollars earned and received by the Publisher less any discounts, taxes, bad debts, customer returns and excluding any sums charged separately to the customer for shipping. Sales or licenses made to any subsidiary or affiliate companies shall be accounted as though made to unrelated parties.

5.    (d)    Royalties shall not be due on any revenues earned abroad, where any foreign government blocks the conversion or transmittal of such monies to the United States, until such revenues can be transmitted.

5.    (e)    No royalties shall be paid in connection with:

(1)    fees received for the use of illustrative material, if any, prepared by the Publisher or at the Publisher's request, plates, negatives, type, tape or other property of the Publisher;

(2)    any grant of rights by the Publisher at no charge for transcription into Braille, large type publication or otherwise for use by persons with disabilities;

(3)    remainder copies and other copies sold below or at cost including expenses incurred, or furnished free to the Authors, or for review, advertising, sample or similar purposes which may benefit the sale of the Work;

(4)    copies donated to charity.

5.    (f)    The royalties accruing to the Authors hereunder shall be divided as follows:

1/3 Mario Moussa

1/3 Madeline Boyer
1/3 Derek Newberry

**Accounting**

6.     Payments to the Authors shall be made semiannually, on or before the last day of April and October of each year for royalties due for the preceding half-year ending the last day of February and August respectively. The Publisher may take credit for any returns for which royalties have been previously paid. The Publisher may retain a 20% reserve for future returns for three royalty periods, provided the accounting statements indicate the amount of the reserve and how it has been applied. Any offsets against royalties or sums owed by the Authors to the Publisher under this Agreement or any other agreement between the Authors and the Publisher may be deducted from any payments due the Authors under this Agreement or any other agreement between the Authors and the Publisher. If the balance due the Authors for any royalty period is less than $100, no payment shall be due until the next royalty period at the end of which the cumulative balance has reached $100. Following execution of the Agreement, the Authors shall be given access to the Publisher's "Author Services Website," which will provide the Authors with access to the Authors' royalty information online.

**Authors' Copies**

7.     Upon publication the Publisher shall give 10 free copies of the Work to each Author, who may purchase, for personal use only, additional copies of the Work at a discount of 40% from the then current United States catalog list price and may purchase, for personal use only, the Publisher's other publications, except journals, at a discount of 25% from the then current United States catalog list price.

**Competing Works**

8.     No Author shall, without the Publisher's prior written consent, publish or permit any third party to publish the Work or any portion thereof or any other version, revision or derivative work based thereon in any media now known or later developed. An Author may, however, draw on and refer to material contained in the Work in preparing articles for publication in scholarly and professional journals and papers for delivery at professional meetings, provided that credit is given to the Work and the Publisher.

The Work shall be each Author's next manuscript for each Author's next book-length work whether under the Author's name or in collaboration with any other author.

No Author shall, without the Publisher's prior written consent, prepare or assist in the preparation of any other work on the same subject as the Work that might, in the Publisher's reasonable judgment, be directly competitive with the Work.

**Remainder Copies**

9.     When the Publisher determines that the demand for the Work is not sufficient to warrant its continued manufacture and sale, the Publisher may discontinue maintaining an inventory of the Work and may remainder all bound copies and sheet stock.

**Name/Likeness**

10.     The Publisher shall have the right to use the name, likeness and biographical data of each Author on any edition of the Work or on any derivative work thereof, and in advertising, publicity or promotion related thereto and may grant such rights in connection with the license of any subsidiary rights in the Work. Each Author shall provide in a timely manner any information reasonably requested by the Publisher for use in promoting and advertising the Work.

**Credit**

11.     The Authors' names shall be listed on the cover and title page in the order set forth on the first page of this Agreement unless otherwise set forth below:

Mario Moussa, Madeline Boyer, and Derek Newberry

**Title of the Work**

12.     The rights in the title of the Work, and any series titles used on or in connection with the Work, including without limitation any trademark, service mark or trade dress rights, shall belong solely to the Publisher, and the Authors hereby transfer and assign to the Publisher in perpetuity any rights the Authors may have in such titles and trade dress.

**Authors' Property**

13.     The Authors shall retain a copy of the manuscript of the Work, including any illustrative material. The Publisher may, after publication of the Work, dispose of the original manuscripts, illustrative material

and proofs. The Publisher shall, however, on written request made prior to publication, make reasonable efforts to return any original illustrative material supplied by the Authors. The Publisher shall not be responsible for loss of or damage to any property of the Authors.

**Revised Editions**   14.   If the Publisher determines that a revision of the Work is desirable, the Publisher may request one or more of the Authors to prepare the revised edition and such Author(s) shall advise the Publisher within 60 days whether the Author(s) shall do so in accordance with the schedule set forth by the Publisher. If the Author(s) advise the Publisher that the Author(s) shall prepare the revised edition, the Author(s) shall diligently proceed with the revision, keep the Publisher advised of the Author's(s') progress, and deliver the complete manuscript to the Publisher on the scheduled due date.

If an Author does not participate in the revision, or does not diligently proceed with the revision (a "non-participating Author"), the Publisher shall have the right to arrange with any remaining Authors and, at the Publisher's option, others, for the preparation of the revised edition. In such case, the Publisher shall have the right to deduct from the non-participating Author's royalties any fees or royalties paid to the reviser(s) provided that the non-participating Author's royalties shall not be reduced by more than 50% for the first such revised edition. No royalties shall be paid to the non-participating Authors with respect to further revised editions not prepared by such Author. The revised editions may be published under the same title and may refer to the Authors by name, but credit may be given to the reviser(s) in the revised edition(s) and in advertising and promotional material with respect thereto.

Except as otherwise provided herein, the provisions of this Agreement, including royalty terms (but excluding the advance provided herein), shall apply to each successive revised edition as though it were the first edition.

**Option**   15.   The Authors shall submit to the Publisher a book proposal with a table of contents or a complete manuscript for the Authors' next book-length work (the "Next Book") whether written singly or jointly before offering rights to the Next Book to any other publisher. The Publisher shall notify the Authors within 60 days after receipt of such proposal or manuscript, or within 60 days following the Publisher's first publication of the Work, whichever is later, whether it desires to publish the Next Book. If the Publisher, within such period, notifies the Authors that it does wish to publish the Next Book, the parties shall negotiate in good faith with respect to the terms of such publication. If within 30 days thereafter, the Authors and the Publisher are unable to agree on such terms, the Authors may offer rights to the Next Book to other publishers. If thereafter the Authors receive a bona fide offer for the Next Book from any third party, the Authors shall submit the terms of such offer to the Publisher in writing and the Publisher shall have 5 business days thereafter to advise the Authors whether it shall publish the Next Book on such terms. If the Publisher does so, the Authors shall enter into a contract with the Publisher incorporating such terms but otherwise in the form of this Agreement.

**Warranty**   16.   The Authors jointly and severally represent and warrant that: the Work is original except for material for which written third party permissions have been obtained; it has not previously been published and is not in the public domain; the Authors have the right to enter into this Agreement and own and can convey the rights granted to the Publisher; the Work contains no libelous or unlawful material or instructions that may cause harm or injury; it does not infringe upon or violate any copyright, trademark, trade secret or other right or the privacy of others; and statements in the Work asserted as fact are true or based upon generally accepted professional research practices. The Authors shall hold the Publisher and its distributors and licensees harmless against all liability, including expenses and reasonable counsel fees, from any claim which if sustained would constitute a breach of the foregoing warranties. Each party shall give prompt notice to the others if any claim is made and the Authors shall cooperate with the Publisher, who shall direct the defense thereof. Pending any settlement, final resolution or clear abandonment of a claim, the Publisher may engage counsel of its choice and may withhold in a reasonable amount sums due the Authors under this or any other agreement between the parties. The provisions of this paragraph shall survive termination of this Agreement.

**Infringement**   17.   If the copyright in the Work or in any derivative work is infringed, the Publisher shall have the right, but not the obligation, to pursue a claim for infringement in such manner as it deems appropriate. Upon

request, the Authors shall provide reasonable assistance to the Publisher in connection with the Publisher's pursuit of such claims.

**Disagreements**　18.　In the event of disagreement among the Authors that precludes the timely submission of a complete and satisfactory manuscript or otherwise interferes with the publication of the Work, the Publisher shall have the right but not the obligation to determine how the disagreement shall be resolved and its determination shall be final. In addition, the Publisher shall have the right, by written notice, to terminate this Agreement with respect to one or more of the Authors pursuant to Paragraph 21 below, or discontinue the participation of one or more of the Authors, in which case such Author shall not participate in any further efforts with respect to the Work and such Author's share of royalties shall be adjusted to reflect the amount of material actually contributed by such Author to the published Work, as determined by the Publisher in its reasonable judgment.

**Termination by Authors**　19.　(a)　The Authors jointly may terminate this Agreement by written notice to the Publisher if the Publisher does not reply to the Authors' request for required changes pursuant to Paragraph 2(c) above, or if the Publisher does not publish the Work within the time specified in Paragraph 3(a) above, for reasons other than as specified therein.

19.　(b)　The Authors jointly may terminate this Agreement prior to publication by written notice to the Publisher if a voluntary petition in bankruptcy under Title 11, United States Code is filed by the Publisher or an involuntary petition under Title 11, United States Code is filed against the Publisher and an order for relief is entered.

19.　(c)　Upon termination of this Agreement by the Authors pursuant to subparagraph (a) or (b) above, the Publisher agrees to revert to the Authors all rights herein granted and the Authors shall retain as liquidated damages in lieu of any other damages or remedies, any payments received by the Authors from the Publisher with respect to the Work. Upon termination, the Publisher shall use good faith efforts to remove the Authors' names from author listings for the Work in its systems (e.g. feeds for pre-publication publicity) but shall have no liability for any use of the Authors' names in connection with the Work by third parties.

**Available for Purchase**　20.　If the Publisher, in its sole discretion decides that sales of the Work are not sufficiently profitable to keep it "available for purchase" and the Publisher does not, within six months after receipt of a joint written request from the Authors make it available for purchase or contract to make it available for purchase within a reasonable time, all rights granted to the Publisher shall, at the end of the six-month period revert to the Authors, subject however, to any option, license, or contract granted to third parties prior to the date of the reversion, and further subject to the Publisher's right to continue to publish and sell any then-existing derivative work based on the Work, all subject to the rights of the Authors and the Publisher to their respective shares of the proceeds from such license or use under this Agreement. The Work shall be deemed to be "available for purchase" for this purpose if any English language edition of the Work is on sale or is otherwise available or is under option or contract for publication under the Publisher's or any other imprint, or if the Publisher or its licensee offers for sale copies of the Work to be produced, manufactured or electronically transmitted, upon receipt of orders therefor.

**Termination by Publisher**　21.　(a)　The Publisher may terminate this Agreement with respect to one or more of the Authors prior to publication in the event:
　　　　(1)　the Authors fail to deliver a complete and satisfactory manuscript pursuant to Paragraph 2(a) above by the Due Date or fail or refuse to make the changes requested by the Publisher pursuant to Paragraph 2(b) above; or
　　　　(2)　the Publisher does not exercise its exclusive right to publish the Work pursuant to Paragraph 2(e) above; or
　　　　(3)　the Publisher exercises its right to terminate pursuant to Paragraph 18 above; or
　　　　(4)　publication may result in legal liability unacceptable to the Publisher in its reasonable judgment.

21. (b) Upon termination of this Agreement by the Publisher as to all of the Authors pursuant to subparagraph (a) above, the Authors shall promptly repay to the Publisher any advances or other payments made to the Authors hereunder. Upon receipt of such repayment, the Publisher shall revert to the Authors all rights herein granted, and the Publisher shall have no further obligation or liability hereunder. Upon termination, the Publisher shall use good faith efforts to remove the Authors' names from author listings for the Work in its systems (e.g. feeds for pre-publication publicity) but shall have no liability for any use of the Authors' names in connection with the Work by third parties.

21. (c) In the event of termination as to one or more but not all of the Author(s), the Publisher agrees to revert to the terminated Author(s) all rights herein granted to the Publisher in any discrete chapters contributed solely by such terminated Author(s) and the Publisher shall have no further obligation or liability to such Author(s) hereunder. Upon termination, the Publisher shall use good faith efforts to remove such terminated Authors' names from author listings for the Work in its systems (e.g. feeds for pre-publication publicity) but shall have no liability for any use of such Authors' names in connection with the Work by third parties.

**General**

22. (a) The engagement of the Authors is personal and the rights hereunder granted to the Authors are not assignable nor may the obligations imposed be delegated without the prior written consent of the Publisher; provided however, that an Author may assign any sums due to such Author hereunder without the Publisher's consent.

22. (b) Except as provided in the preceding subparagraph, this Agreement shall inure to the benefit of the heirs, successors, administrators, and permitted assigns of the Authors and the subsidiaries, successors, and assigns of the Publisher.

22. (c) All notices to be given by either party hereunder shall be in writing and shall be sent to an Author at the Author's address as it is set forth in this Agreement unless such address has been changed by proper written notice, or to the Publisher, addressed to the attention of the Vice President & General Manager. Any notice required to be given jointly by the Authors must be signed by all of the Authors.

22. (d) This Agreement shall not be subject to change or modification in whole or in part, unless in writing signed by the party or parties against whom enforcement is sought.

22. (e) No waiver of any term or condition of this Agreement or of any part thereof shall be deemed a waiver of any other term or condition of this Agreement or of any breach of this Agreement or any part thereof.

22. (f) This Agreement shall be construed and interpreted pursuant to the laws of the State of New York applicable to contracts wholly entered into and performed in the State of New York. Any legal action, suit or proceeding arising out of or relating to this Agreement or the breach thereof shall be instituted in a court of competent jurisdiction in New York County in the State of New York and each party hereby consents and submits to the personal jurisdiction of such court, waives any objection to venue in such court and consents to service of process by registered or certified mail, return receipt requested, at the last known address of such party.

22. (g) The Authors, if they are US residents, must submit a completed IRS Form W-9 (Request for Taxpayer Identification Number and Certification) to the Publisher. No payments will be made under this Agreement without a completed W-9 form (attached). A non-US resident Author will incur a 30% foreign tax withholding which may be reduced provided the Author resides in a country with a tax rate treaty with the United States and submits a completed IRS Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding) with a U.S. taxpayer identification number (ITIN) or a foreign tax identification number.

22. (h) The provisions of Paragraph 16 above and this Paragraph shall survive the termination of this Agreement.

Mario Moussa

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

Social Security Number
(or, for non-resident aliens, U.S. Taxpayer
Identification Number)

629 Pine Street
Philadelphia, PA 19106
Address

Moussa@moussaconsulting.com
Email Address

4/15/15
Date

8/15/56
Date of Birth

USA
Citizenship

Madeline Boyer

SSN: 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
Social Security Number
(or, for non-resident aliens, U.S. Taxpayer
Identification Number)

939 N. Bambrey St
Philadelphia, PA 19130
Address

medina.ann.boyer@gmail.com
Email Address

April 15, 2015
Date

September 25, 1987
Date of Birth

USA
Citizenship

Derek Newberh

546-91-000
Social Security Number

By
Matt Holt
Vice President and Publisher
Professional Development

Date  4/20/15

(or, for non-resident aliens, U.S. Taxpayer
Identification Number)

221 S. 12th St, $709
Philadelphia, PA 1907
**Address**

Josh.newberry@gmail.com
**Email Address**

4/15/15
**Date**

/10/83
**Date of Birth**

USA
**Citizenship**

# EXHIBIT C

# Closing the Saying-Doing Gap: The Breakthrough Process for Creating High-Performance Teams

Mario Moussa
Madeleine Boyer
Derek Newberry
Joanne Baron
Vishal Bhatia
Amy Brown
Lauren Hirshon
Michael Joiner
Annette Mattei
Renee Torchia

High-Performance Experts from the Wharton School's Executive Development Program

1

## A Note From and About the Authors

Yet another book about teams?  *Really*?

Really.

Our group formed in early 2013 -- a diverse mix of organizational development consultants, cultural anthropologists, and MBAs.  Our task: Revamp the way teamwork was taught in the Wharton Executive Development Program (EDP).  That task inspired our group and transformed it into *our team*.

We came to call ourselves the HPT (High Performance Team) Observers.  For over two years, we have conducted extensive field research on more than one hundred teams composed of EDP participants from around the world. We also have over one hundred years of collective experience working with teams in other settings: Fortune 100 corporations, international agencies, non-profits, industry associations, and research labs.  Augmented by interviews with leading experts and findings from secondary research, this brief book distills all we have learned about a repeatable breakthrough process through which groups achieve peak performance.

So yes, we did indeed write yet another book about teams.  Why?  Because we believe we have something new to say about how people actually get work done, something that will utterly revolutionize the way you collaborate with others and will produce exceptional results.  Many talented global leaders have already started using our breakthrough process to close the saying-doing gap.  Read on to learn why.

*The Authors*

2

Mario Moussa teaches in EDP, oversees the HPT Observer team, and managed the process of writing and editing this book.  He is the Co-Director of the Wharton Strategic Persuasion Workshop and the co-author (with G. Richard Shell) of *The Art of Woo: Using Strategic Persuasion to Sell Your Ideas.* Mario also advises leaders at the world's top companies about organizational effectiveness, strategy, and change.

Madeleine Boyer is a doctoral candidate in Anthropology (to be completed May 2015) at the University of Pennsylvania.  She is a Lecturer in the Wharton School. She also consults to Fortune 500 companies on teamwork, collaboration, and managing organizational culture.

Derek Newberry, Ph.D., conducts analysis on the relationship between team dynamics and performance outcomes in EDP. He is a Lecturer in the Wharton school and the Anthropology department at the University of Pennsylvania.  Derek also consults to Fortune 500 companies on enhancing collaboration and managing organizational culture.

Joanne Baron, Ph.D., is a lecturer in the department of anthropology at the University of Pennsylvania. Since 2013, she has worked in  EDP, where she has been an observer and played the role of foreign governments.

Vishal Bhatia is currently a director at the MBA Program at The Wharton School. He advises students and develops opportunities for experiential learning outside the classroom. He is the founder of the music management firm, OfficialCOMMUNITY, which pioneered the industry-changing concept of developing and monetizing online music communities and counts iconic artists among its clients.

Amy Brown, Ph.D., is a social anthropologist and educator who draws on years of experience as a qualitative researcher, teacher, curriculum writer and professional

3

developer to help empower teams and individuals to work towards maximizing their potential. Her book, *A Good Investment? Philanthropy and the Marketing of Race in an Urban Public School,* is forthcoming from the University of Minnesota Press. She is a faculty member in the Critical Writing Program at the University of Pennsylvania.

Lauren Hirshon is a public sector strategist, coach and innovator. She has a broad set of interests and areas of expertise, including organizational development, change management, group and team dynamics, and public administration.  In various roles at the University of Pennsylvania and Harvard, she consults with governments and nonprofits

Michael Joiner will complete his Ph.D. in anthropology at the Univserity of Pennsylvania in 2015.  Before coming to Penn, Michael  worked in the field of global health.

Annette Mattei is an independent consultant who supports governmental and non-profit organizations in developing and executing research initiatives and other mission-related activities.

Renée Gillespie Torchia, Ph.D., is a strategic consultant, coach and researcher helping leaders understand how personality and communication affect results. Renée has played facilitative roles in Wharton executive programs and for private businesses. She is currently Vice President of Culture and Leadership for a New York financial district company.

## Introduction: "Can I Make My Team Work?"

Intense!

Twisting your features into a mask of pain, you dig your heels into the soft grass and grip a rope that tears into your skin. Sweat runs down your face as blood seeps from spidery cracks in your palms. Onlookers gawk and yell.

A clear, tiny voice speaks to you amid the confused thoughts swirling in your head: "So-o-o-o . . . what am I learning from this experience?"

Well, you *should* be learning about teamwork. You are in the middle of one those exercises that have become commonplace at company retreats -- in this case, pulling a large rock 30 feet. Your supervisor decided to start by having you try going it alone. Yet, despite all of your early-morning workouts at the gym, you failed to move the boulder even an inch. To achieve a different result, you clearly need to work with others.

Teamwork gets things done, right?

As others join you, one by one, the collective rope-pulling effort seems to demonstrate the point. Little by little, the boulder starts moving until it nudges over the 30-foot mark. Cheers erupt. But you noticed something odd. With each new person who contributed to the effort, the boulder moved a little bit faster, but not as fast you would have imagined. By the time the tenth person steps up, you feel the group is barely pulling harder than when it was only six, even though everyone seems to be working hard.

5

Afterward you ask others if they noticed the same thing.  Everyone you ask says pretty much the same thing: "*I was pulling my weight, but it sure seems that others weren't.*"

*1 + 1 = . . . 1.5?*

If the boulder exercise sounds like something you have experienced on your own teams, then you have encountered a well-known phenomenon first identified by Max Ringelmann in the early 20th century: social loafing.  It names the tendency to apply less and less effort to a task as more people become involved with it.  In the original studies of what became known as the Ringelmann Effect, the French engineer analyzed the amount of energy expended by his students in a role-pulling contest.  As each side expanded its team, each team member slacked off somewhat.  No synergies here: 1 + 1 equals something less than 2, as illustrated in Figure No. 1.





Hence the question that led us to write this book: How do you make a team perform at a high level despite the fact that few teams end up being truly greater than the sum of their parts?  Our own team has spent years studying this question and troubleshooting team performance barriers.  We are social scientists, MBAs, and organizational development consultants who have decades of combined experience researching and consulting on group dynamics.  We refined our perspective on

teamwork in the living business laboratory of the Executive Development Program (EDP) at the Wharton School of Business.

At the heart of our insights is the EDP business simulation -- or "sim," as we call it. To give you a sense of how this "laboratory" works and why it helps us to crystallize the key features of high and low-performance teams, let us bring you into the world of the sim, entering the way the hundreds of participants do every year.

You sit huddled in a conference room with six other executives from every continent on the planet. They are your teammates.  You have never met any of them before and, given the number of languages spoken in the room, you may have trouble communicating with them about the most basic topics.  To make matters worse, you know next to nothing about your company's industry, and neither does anyone else. But all of you have to quickly ramp up and as a team make a series of business decisions.  Biggest issue: sales are down in your company's most important region. Why?  Is it product quality?  Poor marketing?  Your team needs to do research into the possible causes before it can determine what to do and where to invest.  Your peers will scrutinize your team's decisions and results in a public forum.

Do you want to join this company?  Probably not, because it sounds like a nightmare. But we would strongly encourage you to spend a few days of your life working in it. This is the world of Wharton's EDP, which attracts leaders and rising stars from all around the world who for two intensive weeks develop a broad range of business skills under the guidance of world-class faculty and Academic Director Peter Fader, Frances and Pei-Yuan Chia Professor of Marketing.  A cornerstone of the program is the live, immersive sim, where teams of participants compete as companies in a global market for medical devices.  Some teams are suppliers of the devices, which are called MEDs, while others are manufacturers.

During the program, teams negotiate deals, develop relationships with governments, and make decisions about how to allocate limited resources as they

7

compete for market share.   The industry ecosystem is highly sophisticated, capable
of simulating variables such as customer preferences and investor decisions to
produce detailed financial performance results for each company.  The participants
experience the full range of emotions during the simulation.  Tensions bubble to the
surface, conflicts erupt, victories are celebrated enthusiastically, and long-lasting
friendships are formed.  You want to experience pressure?  Try competing in the
MEDs industry.  You want to cut to the core of how teams work?  You can do it there,
too.

Through our experience observing and giving feedback to over 100 of these EDP
teams, in addition to conducting our own research and consulting, we have created
a framework for improving team performance.  But before we get deeper into that
framework, let's look more closely at the puzzle Max Ringelmann analyzed over a
century ago.

### Playing by the Rules (But Which Ones?)

The first question you should ask about your team is whether it has established
commitments around the basic elements of its structure.  Research on group
dynamics has shown that teams maximize productivity when they agree upon goals,
roles, and norms.  The reason for this is simple: people need rules to function.  These
rules can be explicit, such as putting on the brakes at a stop sign, or paying the check
at the end of a meal.  They can also be unspoken, such as the shared understanding
in professional basketball that players get high-fived after every free-throw.

For any particular group there will be countless such rules: how members dress,
greet each other, conduct meetings, and on and on.  Add them all up and what you
get is a picture of the group's culture -- its shared rules, explicit and implicit, about
how to communicate and behave.  These rules are the glue of all social interaction,
and as humans we need them to survive.  As the famous anthropologist Clifford
Geertz observed, culture is what defines us as human beings.  Without it, our

8

attempts to collaborate would degenerate into *"a mere chaos of pointless acts and exploding emotions."*

Teams, like any group, start making rules that govern group behavior naturally because it is what we do as humans to be able to interact and work together. Put two or more people together and a culture starts to take shape automatically. Teams perform better when they agree upon these rules about values, decision-making norms, and the like, because the rules sync up their collective actions. We find that three of these cultural dimensions have the most influence over a team's results. We call these key agreements about team structure the Three Foundations of HPTs:

## The 3 Foundations of HPTs



1. **Goals**: Do you have a shared vision and specific goals that not only establish clear performance targets, but also tap into the *values* that are meaningful to individual members?

2. **Roles**: Do you have clearly defined roles that include both the *formal* and *informal* aspects of teamwork, such as facilitation, coaching, and mediation?

3. **Norms**: Do you have mechanisms for making decisions, sharing information, and resolving conflicts so that clear expectations are set for team *behaviors*?

9

While rule-making is a critical first step, it is one that must be continually revisited, because human beings are rule-making machines that are always creating new rules that can undermine the original foundations of the team.

As an example, consider one of our own EDP teams, the Diamondbacks. The Diamondbacks were eight guys with big personalities who immediately clicked when they met as participants in Wharton's EDP, and decided to join as a team for our skill-building workshop.  Full of former soldiers and athletes, the Diamondbacks adopted the "Git-R-Done" motto.  Made famous by the blue-collar comedian, Larry the Cable Guy, the catchphrase (and maybe philosophy of life) is all about just putting your head down and doing the job.  In other words, for the Diamondbacks, speed and action (and fun) were priorities over long range planning.

They were an energetic group that meshed right away, and they established their culture up front.  Git-R-Done defined the rules that would align this group of doers and propel them to dominance in the simulation—or so they thought.  By mid-week the Diamondbacks were struggling.  Their turbo-charged culture had pushed them to make deal after deal. In fact, they did so well, they oversold! They burnt relationships with other teams by not being able to deliver on the sales they had promised. Their big personalities that helped to grease the wheels of making deals were suddenly viewed as political and untrustworthy.

Despite their "Git-R-Done" approach, the Diamondbacks unfortunately didn't end up getting much of anything done for the first half of the workshop!  Getting back to their rule of brotherhood, they pulled together with the support of their female team observer, the emergence of a co-leader, and more than one come-to-Jesus moment.  At the end of the two-week EDP, they were on an upward trajectory and in high spirits. They are still one of the most legendary of EDP teams, a great example of the benefits and dangers of a strong culture and its rules.

# EXHIBIT D

**Megan O'Connor**

| | |
|---|---|
| **From:** | Megan O'Connor |
| **Sent:** | Tuesday, April 26, 2016 3:14 PM |
| **To:** | Megan O'Connor |
| **Subject:** | FW: Request for New Vendor Information - Derek Newberry |
| **Attachments:** | ATT00001.htm; image002.png; Vendor information request_Duke CE (US)_updated 1-12-2016.docx; ATT00002.htm |

Begin forwarded message:

**From:** accounting <accounting@dukece.com>
**Subject: Request for New Vendor Information - Derek Newberry**
**Date:** March 29, 2016 at 2:07:22 PM EDT
**To:** "'derek@percipientpartners.com'" <derek@percipientpartners.com>
**Cc:** accounting <accounting@dukece.com>

Dear Derek,

Thank you for providing your W-9. Please complete the vendor information request and return it to accounting@dukece.com at your earliest convenience so that I can complete your vendor set-up.

Kind regards,

**Richard Keeble**
Senior Financial Analyst
Duke Corporate Education | 310 Blackwell Street | Durham North Carolina 27701 USA
phone: + 1 919.680.5000



**Vendor setup information request for Duke Corporate Education**

In order to set you up as a vendor in our accounting system so that we may remit payment to you for services rendered, it is necessary that you provide certain information to allow us to do so.

Please provide the following information to accounting@dukece.com as soon as possible, preferably within three (3) business days.  This will ensure that once we receive your invoice that your payment will not be delayed because you have not been set up as an approved vendor in our accounting system.

Your Name: _____

Company* Name: _____

*(if payment is being remitted to an entity other than an individual)

Type of business (check one): Individual ____   Partnership ____   Corporation ____

Address (individual or entity): _____

_____

_____

_____

Country of Residence:
(individual or entity)                          _____

Telephone Number:                          _____

Email address:                                  _____

Contracting Currency:                       _____

Please complete and return the following IRS document as appropriate:

- Form W-9 (if you are a US person or entity).
- Form W-8BEN - Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)
- Form W-8BEN-E  - Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities)

*Please note:  If you are being asked to provide services in a jurisdiction where you have not delivered previously, you should consult with both your tax and immigration advisors.*



| INTERNATIONAL WIRE INFORMATION |
|---|

| Intermediary Financial Institution (if applicable) |
|---|
| Swift Code: |
| Bank Name: |
| Bank Address: |
| |
| Beneficiary Financial Institution |
| Swift Code: |
| IBAN: |
| Sort Code/Brach Code: |
| Bank Name: |
| Bank Address: |
| |
| Beneficiary Account Name: |
| Beneficiary Account Number: |
| Beneficiary Address: |
| Account currency: |

| US DOMESTIC WIRE INFORMATION |
|---|

| Beneficiary Financial Institution |
|---|
| ABA #: |
| Bank Name: |
| Bank Address: |
| |
| Beneficiary Account Name: |
| Beneficiary Account Number: |
| Beneficiary Address: |
| Account currency: |